JAMES P. MOONEY ET AL., APPELLEES, V. DRAINAGE DISTRICT NO. 1 OF RICHARDSON COUNTY ET AL., APPELLANTS.

FILED FEBRUARY 21, 1934. No. 28633.

*Wiltse & Wiltse* and *W. J. Courtright,* for appellants.

*J. B. Cain* and *Hall, Cline & Williams, contra.*

Heard before Goss, C. J., Rose, Good, Eberly, Day and Paine, JJ., and Clements, District Judge.

Clements, District Judge.

This is an action brought by the plaintiff, James P. Mooney, for himself and all others similarly situated, asking for an order requiring the defendant, a drainage district organized under article 4, ch. 31, Comp. St. 1929 (sections 31-401 *et seq.*) to increase the carrying capacity of the outlet of a drainage canal constructed by it, to an extent sufficient to drain the plaintiff's land of water brought to it by the ditches and laterals constructed by the district.

The outlet to defendant's drainage canal is common to it, and eight other drainage districts that have been organized in the same watershed and along the same stream, "The Great Nemaha river."

When the action was commenced, all these other districts were made parties defendant on the theory that the court, in this action, could order them to contribute to the cost of the proposed enlargement of the outlet.

Demurrers filed by these other districts to the petition were sustained, and the action dismissed as to them.

The cause was tried before the Honorable John B. Raper, of the first judicial district, resulting in a finding for plaintiff and an order requiring the defendant district to increase the carrying capacity of the outlet of the canal to approximately 11,500 cubic feet of water per second.

Both parties appeal; the defendant from the entire finding and judgment of the court; the plaintiff from the order that the increase in carrying capacity shall be only to 11,500 cubic feet per second, plaintiff claiming that such carrying capacity is entirely inadequate and not based upon any evidence in the case.

An examination of the pleadings leads to the conclusion that, in preparing them, the parties entirely overlooked the admonition of the statute that they shall be "in ordinary concise language without repetition." The petition consists of 23 pages. The answers originally contained 51 pages. Twenty-eight paragraphs of the answers were stricken out by the trial court as immaterial. The trial of the case seems to have been conducted in the same expansive spirit in which the pleadings were framed. The bill of exceptions contains approximately 1,000 pages of evidence, much of which it is entirely unnecessary to consider.

From this mass of evidence, we gather the following facts which seem to be pertinent to the issues: On February 14, 1906, the defendant Drainage District No. 1 of Richardson county was established by decree of the district court of that county. This district occupies about 30 miles of the lower part of the valley of the Great Nemaha river, and consists of about 31,000 acres of land. The district was organized for the purpose of constructing a system of drainage for the land. After the establishment of the district, and in conformity with the law under which it was organized, an appraisement of the benefits to this land to be expected from the construction and maintenance of a suitable drainage system was made. These benefits were shown to be in the aggregate the sum of $1,190,387.66.

A drainage system was then constructed at a cost of approximately $285,909. Since the construction of this drainage system, the district has expended for improvements, repairs, and maintenance, the further sum of $275,127. To meet these expenditures assessments have been made aggregating the sum of $561,036. Of this sum, Richardson county has paid $35,718, and the Burlington and the Missouri Pacific railroads have paid as benefits the sum of $36,104, the balance, being approximately the sum of $459,654, was assessed to and paid by the landowners of the district. Just how much of the total expenditures should be charged against the appraised benefits the record does not disclose, but, assuming that it should be all so charged, it will be seen there is still $629,351 of unassessed benefits upon which the district can draw by assessments for legitimate purposes.

The plaintiff and the others, in whose interest he sues, are owners of approximately 6,000 acres of land within the district. This land lies in the extreme lower part of the Great Nemaha river valley, between a point on said river designated in the pleadings and evidence as bridge 64 and the Missouri river. The location of this bridge is between seven and eight miles from the junction of these rivers. This 6,000 acres of land has little elevation above the river, and before the construction of the drainage system was low, wet land. It was appraised as 100 per cent. land; that is, it was appraised as receiving the maximum benefit from the drainage. Of the $459,654 assessed against the 31,000 acres of land in the district, this 6,000 acres was assessed the sum of $137,310.

When the drainage system was constructed, nearly all the work was done and money expended above bridge 64. Some work was done between this point and the Missouri river, in removing brush and logs from the Great Nemaha river, but its channel was not enlarged or deepened. It seems to have been assumed that the natural channel of the river below bridge 64 would be sufficient to take care of the run-off from the entire watershed. This assump-

tion proved correct for a time, and during some years after the construction of the drainage system, it operated satisfactorily and the land of the complaining landowners was drained and received the benefits expected. However, as years passed, improvements were made in the upper part of the district. The channel of the river was straightened, erosion increased the size and carrying capacity of the ditches and laterals, other drainage systems were constructed higher up on the river, and the run-off of the watershed was emptied into the main stream and by it brought to bridge 64 so rapidly that the channel of the river below that point was, and now is, entirely inadequate to take care of it; the consequence being that, whenever there is any considerable rain over the watershed, the water overflows the banks of the river below bridge 64, inundates the plaintiffs' land, ruining their crops, and rendering their situation as farmers intolerable. It is shown by the evidence that, owing to this cause, one to three floods occur each year which cover the valley below bridge 64 from bluff to bluff a depth of one to three or four feet. In this condition of affairs, the plaintiffs petitioned the officers of the district to take steps to increase the carrying capacity of the outlet of the drainage system to take care of this influx of water, and, their petition being refused, they brought this action asking that a mandatory injunction issue directing the defendant to take such steps for their relief.

The defendant district seeks to justify its refusal to afford relief to the plaintiffs on several grounds:

1. That the law under which the district was organized is unconstitutional, and the court has no jurisdiction to order or decree to plaintiffs any relief. It is argued that the whole act under which the district is organized is unconstitutional and void because it purports to give legislative power to the courts. The answer to this is the act does not purport to, nor does it, confer upon the court any powers other than its ordinary judicial functions. This matter was considered by us in the case of *Barnes*

*v. Minor,* 80 Neb. 189. In that case the constitutionality of the act was attacked upon the same ground as in this. The law was held to be constitutional, the court saying:

"Manifestly, as it seems to us, the court in such a proceeding is called upon to exert no other than its ordinary judicial functions. The statute prescribes that, if certain steps have been taken and certain facts exist, a governmental corporation shall be deemed to have been created, not otherwise, and the court by the exercise of its usual powers and by the observance of judicial methods ascertains and determines that such steps have or have not been taken, or that such facts do or do not exist, and from these premises draws an inference or reaches a conclusion which it pronounces in a form of a judicial order or judgment in like manner and in like effect as in ordinary cases."

We are entirely satisfied with our holding in *Barnes v. Minor, supra,* and with the reasoning upon which it is based. However, if we were not, we would have no hesitation in refusing to hold the organization of this district invalid at the behest of the district itself, after it has functioned for 28 years, has made and collected assessments, built and improved a drainage system, borrowed money, issued bonds, invoked the powers of the courts, sued and been sued, all as a public corporation organized under the law it now claims is void because unconstitutional.

It is also contended that the law is unconstitutional because section 31-456, Comp. St. 1929, permits assessments beyond benefits as a possibility, and its application would result in an arbitrary apportionment contrary to benefits. This question does not arise in this case unless it is found that section 31-456, Comp. St. 1929, is of such vital importance to the whole act that it was an inducement to the passage of the remainder.

"Whether any specific power which the act undertakes to confer upon the board is constitutional or not, can only be tested when the board assume to exercise it, and

the other portions of the act could not be defeated by its invalidity, unless the nature of such unconstitutional power was such as to render it of vital importance to the whole." *People v. Mahaney*, 13 Mich. 481.

"Invalid provisions of an act, not operating to avoid the whole, cannot be relied on to excuse the performance of a duty enjoined by the valid portions of the act." *State v. Malone*, 74 Neb. 645.

We are satisfied that the provisions of section 31-456, Comp. St. 1929, are not so vital to the act that the law would not have been passed without its inclusion. The act seems to be complete and capable of enforcement without reference to this section. When assessments are attempted to be made under the provisions of this section, its validity can be tested. We express no opinion as to its constitutionality, leaving that to be determined in a proper case.

2. The defendant's second contention is that the drainage board has exclusive power to determine what drainage work shall be done, and the court is without power to direct what the board shall do.

We think that the situation of the complaining landowners, as shown by the record in this case, leads to the conclusion that they are entitled to the relief asked for; that their land having been appraised as receiving the maximum benefit from the drainage system, and having paid assessments for the construction and maintenance of the system on the basis of such benefits, they should be protected in the enjoyment of these benefits. We are met, however, with the bald statement by the defendant district: "We admit that we have the right and power to make the improvement required to effectuate the relief of plaintiffs, but deny that it is our duty to do so, and therefore the court is without authority to order us to act in the matter." (Reply Brief.)

This then is the crux of the situation. If the district owes a duty to the landowners, whose land was assessed, to build the drainage system, to maintain it, and keep it

in repair, so that they may enjoy the benefits for which the land was assessed, and the district, without sufficient justification, refuses to perform this duty, then the court, in a proper case, has the authority to order it to act in the line of its duty. On the other hand, if the district owes no duty to these landowners, but, as contended by defendant, it has the absolute arbitrary discretion to refuse to maintain all or any portion of the system, then a minority of the landowners who have contributed to its construction may, by a selfish majority, be denied any benefit from the improvement, their property may be taken without just compensation, and their despoilers may defy the courts to afford them any redress. The defendant's theory is so repugnant to the spirit of right and justice that pervades our laws that we approach the subject confident that the act under which this district was organized cannot be so construed.

Both plaintiff and defendant contend that the question has been settled by former decisions of this court. Each maintains that it was settled in his favor. We think both are mistaken, and that we have no controlling precedent upon which to base a decision in this matter. In several former decisions of this court, notably *Bunting v. Oak Creek Drainage District,* 99 Neb. 843, *Hopper v. Elkhorn Valley Drainage District,* 108 Neb. 550, *Miller v. Drainage District,* 112 Neb. 206, and *Flader v. Central Realty & Investment Co.,* 114 Neb. 161, we have said or implied in argument that it is the duty of a drainage district such as the defendant to maintain its drainage system, and that its failure to do so renders it liable in damages to a person injured by its negligence. In some of the cases this thought found its way into the syllabi. However, as pointed out in *Compton v. Elkhorn Valley Drainage District,* 120 Neb. 94, a determination of this question was not necessary to the decision in any of these cases. The statements that it was the duty of drainage districts to maintain their ditches may therefore be regarded as dicta

and not binding as a precedent in the determination of this case.

In *Compton v. Elkhorn Valley Drainage District, supra,* language was used in argument which seems to imply that the court was then of the opinion that the law does not make it the duty of drainage districts to maintain their ditches or keep them in repair. This idea was not, however, reflected in the syllabus. It was used by the court in argument rather than as a vital proposition of law. It was not necessary to the decision in the case, and cannot therefore be considered as a precedent binding upon the court in the instant case. This is true for other reasons. The *Compton* case was an action for damages based upon the common-law liability of a public corporation for an injury caused by the negligence of its officers. It was not, as is this, an action by landowners, whose money has been taken by the district to construct an improvement on the theory that their land would be benefited, to compel repairs necessary if such benefits are to be realized.

Again, in the *Compton* case, the court was not considering the act under discussion here. Elkhorn Valley Drainage District is organized under article 5, ch. 31, Comp. St. 1929. Some of the provisions of this article are similar to provisions in article 4, but the section of article 4 that provides for repairs and improvements is entirely omitted from article 5.

Section 31-463, Comp. St. 1929, provides: "If at any time after the final construction of such improvement the same shall become out of repair, obstructed, inefficient, or defective from any cause, the board of supervisors may order an assessment upon the lands and property benefited by the drainage system for the purpose of placing the same in proper and suitable condition for drainage purposes, using the original assessment upon the property in the district as a basis to ascertain the ratio that each separate tract or lot of land or property bears to the whole amount to be levied."

The interpretation of this section depends entirely upon the construction to be given to the word "may" as used therein. This court has consistently construed "may," when used in a statute to delegate a power, the performance of which involves the protection of public or private interests, as mandatory, and not merely permissive. "Whenever a statute requires the performance of an act for the sake of justice or the public good, the word 'may' is the same as 'shall' and imposes a positive and absolute duty." *People v. Commissioners of Buffalo County*, 4 Neb. 150. When used in a statute, the word "may" is construed as imperative "whenever the public interests or individual rights call for its exercise." *State v. Buffalo County*, 6 Neb. 454. "Where it is plain that the legislature intended to impose a duty rather than confer a privilege" the act is mandatory. *State v. Farney*, 36 Neb. 537. "The word 'may,' when used in a statute or enactment to impose a duty or delegate a power, the performance of which involves the protection of public or private interests, will be read as 'must,' and construed as mandatory." *Doane v. City of Omaha*, 58 Neb. 815. "The word 'may' in public statutes should be construed 'must' whenever it becomes necessary to carry out the intent of the legislature." *Greb v. Hansen*, 123 Neb. 426.

The law under which the defendant is organized conferred upon it the power to collect great sums of money from landowners upon the basis of benefits to be derived from the drainage of their land and its protection from floods and overflows. Was it the intention of the legislature that this money could be spent in the building of a costly drainage system which might through the neglect or obstinacy of drainage officers be permitted to become so defective or inefficient that it would be an injury rather than a benefit to the landowners whose money was taken to construct it and who are ready and willing to pay for needed improvements? The intent of the legislature must be gathered from the whole act. A careful examination of this act leads us to the conclusion that it was the in-

tent of the legislature to make it the duty of the district to maintain its drainage works, within the limits of its power, to the end that the benefits assessed against the land should become and remain effective to the landowners. Again, it is plain that the performance of the power granted to the district by section 31-463, Comp. St. 1929, involves the protection of both public and private interests and that "may," as used in such section, should be construed as mandatory. We therefore hold that it is the duty of the district to take such steps, within the limits of the power conferred upon it by the. law, to make such repairs to its drainage system as may be necessary to drain the land within the district, including the land of the plaintiffs, and to protect such land from overflows and floods.

While this holding is based upon a construction of the statute under which the defendant is organized, it is in consonance with general principles as laid down by textwriters, and the decisions of other courts. In 2 Farnham, Water and Water Rights, 1032, sec. 208, it is said: "An owner of land within the drainage district, who has been assessed for the cost of the drain, may compel the officers, by mandamus, to alter an outlet which has proved to be insufficient to drain his property so as to afford the drainage for which he has paid."

In *Stoddard v. Keefe*, 278 Ill. 512, the court said: "Where the landowners of a district have been assessed and taxed for the construction of drains and ditches for their lands and the ditches or drains as constructed have proved inadequate for the purpose for which they were intended, the landowners have a right to require the commissioners to adopt and construct a system of drainage which will provide main outlets of ample capacity to take care of the waters of the district." See, also, *Peotone & Manteno Union Drainage District v. Adams*, 163 Ill. 428.

3. The defendant contends, in effect, that even if the court should find the law constitutional, and that a duty devolved upon the district to maintain the drainage sys-

tem and keep it in repair, still it cannot be compelled to enlarge the outlet of its canal because the work involves new construction and cannot be considered as repairs. This question was before this court in a former case involving this same defendant. In that case, identical in principle with this, the district took a position exactly opposite to that urged here. The question was disposed of in an able opinion by Judge Shepherd in *Richardson County v. Drainage District No. 1*, 113 Neb. 662. It seems that, as the drainage canal of the district was originally constructed, it followed the lower course of Muddy creek to the Nemaha river. For some distance below the junction of the canal with this river, no excavating was done and the channel of the river was not improved except to remove some obstructions. It was assumed that the river channel would be effective to take care of the water brought to it by the canal. This proved to be correct for some years, but in 1925 the river channel, owing to a number of bends below the junction, to the angle at which the canal entered it, and to a greater influx of water brought to the canal by new drainage works above, became inefficient to provide sufficient drainage and floods resulted. (It will be noted this condition exactly parallels the situation that is responsible for the present action.) The district determined that, to correct this condition, it was necessary and advisable to carry the water to a point below the bends in the Nemaha. This involved the construction of a new ditch two miles long in a different location and at a cost of $35,000. A supplemental assessment to raise this sum was therefore ordered on all the land in the district, based on the original appraisement of benefits. Richardson county, being one of the parties against whom the assessment was made, protested and, its protest being denied, brought an action to enjoin the district from making the proposed improvement. This action was based and the relief asked urged on the same theory advanced by the defendant in the instant case, viz., that the proposed improvement is new work, goes beyond

the limit of repair, and the district is without power to make it. The trial court found against this contention and refused the injunction. The case reaching this court on appeal, we held: "The right of the supervisors to keep a ditch in repair is not limited to making good its defects in the precise place of its original construction, when the nature of the soil and the general topography do not admit of successful operation there, but it includes the right to make the ditch effective to the use for which the license to construct the same was granted, and hence to straighten its channel or to lengthen and better its outlet." We think this is a correct statement of the law. It is buttressed by the holdings of many other courts (see *Lee v. County of Jackson,* 151 Minn. 310; *Board of Supervisors v. Paine,* 203 Ia. 263; *Petersen v. Sorensen,* 192 Ia. 471; *Yeomans v. Riddle,* 84 Ia. 147) and is decisive of this question.

The defendant argues that, as it is undisputed that lands in the upper portion of the district will receive no benefit from the proposed enlargement of the outlet, an assessment against such land would be void because made in excess of benefits. The district has changed its position since it successfully defended in *Richardson County v. Drainage District No. 1, supra,* assessments made for an improvement that not only did not benefit individual tracts of land in the lower part of the district but was a detriment to such tracts by the more rapid influx of water to the land caused by the straightening of the channel of the ditch in its upper reaches. This question was also settled in the former case where we said, speaking of the inefficient condition of the ditch in the upper portion of the district:

"This condition affected every owner in the district, much as a loss of function in the human body affects the whole man, and became a matter of moment to all. * * * The portion of the statute upon which the district depends is found in section 1806, Comp. St. 1922, which provides that, if a ditch of this kind shall become 'out of

repair, obstructed, inefficient, or defective,' the board of supervisors may order an assessment for the purpose of placing the same in proper condition, using the original assessment upon the property of the district as a basis for so doing. * * * It would seem that the statute should be construed liberally for the purpose of giving effect to the intent of the legislature, which undoubtedly was to make the drainage contemplated by the act effective."

Little attention need be given other contentions of defendant, viz.: (1) "No new drainage plan can be carried out until the plans are submitted to, and authority obtained from, the department of public works." The law in question is found is section 81-6329, Comp. St. 1929, and provides: "All plans for proposed drainage districts shall be approved," etc. It is evident this refers to plans for a new drainage system, proposed by a district in process of organization, and has no reference to plans for the improvement or repair of ditches that, after construction, have become inefficient and defective.

(2) "Upper riparian owners, separately or by association in a drainage district, may * * * accelerate the flow of water through natural streams, without being liable to the lower riparian owners." This may or may not be the law, depending largely on whether section 31-456, Comp. St. 1929, is held valid or not. It may be of importance if, and when, an attempt is made to force contribution from other districts for the cost of the improvement. It can have no application in a controversy between the district and landowners whose land has been assessed on the basis of benefits which they are not enjoying because the drainage system has become defective and inefficient.

In view of the foregoing, we hold:

(1) That article 4, ch. 31, Comp. St. 1929, is constitutional in so far as it affects the organization of the drainage district and the construction, maintenance, and repair of a drainage system; that the defendant is duly

organized under said law, and has all the powers and duties conferred thereby.

(2) That an examination of the constitutionality of section 31-456, Comp. St. 1929, is not necessary to the decision of this case.

(3) That a district organized under this act has the power to construct a drainage system and to maintain, improve, and repair it, within the limit of the appraised benefits to the land within the district; that whenever such drainage system becomes out of repair, defective, or inefficient for any reason, it is its duty to improve and repair it, within the limit of its power, so that it may serve the purpose for which it was constructed, and to the end that the landowners may receive the benefits for which the land is assessed.

(4) That the drainage system of the defendant district has become defective and inefficient because the outlet below bridge 64 is too small to properly care for water brought down by the ditches and canals of the district, and to prevent the flooding of plaintiffs' land; that such condition can be remedied and proper improvements and repairs can be made by the district within the limit of its powers.

(5) That the general finding of the trial court for the plaintiff was correct.

We have now to consider plaintiff's cross-appeal.

It is shown by the evidence that the carrying capacity of the outlet of the defendant's drainage system below bridge 64 is 8,440 cubic feet per second, and that this outlet has to take care of the entire run-off of the watershed consisting of an area of 1,875 square miles located in that part of Nebraska having the greatest rainfall. It is conceded by all parties that the outlet is entirely inadequate for such purpose. Four civil engineers were called as witnesses and examined as to the extent to which the outlet should be enlarged to properly care for the water. These men were experts in drainage matters. Their testimony ranged from 18,000 to 25,000 cubic feet per

second. We think the conclusion to be drawn from the evidence is that the minimum capacity of the outlet should be 20,000 cubic feet per second. The trial court first found the figure 20,000 cubic feet to be correct for the enlargement. He later changed this to 18,000 cubic feet, and still later to 11,500 cubic feet, which became the final figure for his decree.

No one is satisfied with this finding. The plaintiff appeals from it. The defendant, in its brief, p. 19, says: "All of the attorneys are agreed that the decision is entirely unsupported by any engineering testimony (or any other testimony)."

We have carefully examined all the testimony in an endeavor to find therein a basis for the trial court's finding. It is true that, in some cases, conditions and circumstances are shown that justify a court in findings not supported by any direct evidence. This does not seem to be such a case. The question of the capacity of an outlet to care for the run-off of a great watershed such as we are considering is peculiarly a problem for experts, and depends upon computations made from a knowledge of the average rainfall, the quality of the soil, the slope of the land, and many other factors not known to laymen. We do not think the court's finding that the outlet should be increased to a capacity of 11,500 cubic feet per second is supported by any evidence, or that such an enlargement is sufficient to afford the complaining landowners the relief to which they are entitled. We therefore hold that the findings and decree of the district court should be modified to require the defendant district to enlarge the outlet of its drainage system between bridge 64 to the Missouri river to a minimum carrying capacity of 20,000 cubic feet per second, and that, as so modified, the finding and judgment should be affirmed.

The defendant complains that such improvement will involve the outlay of a large sum of money which the district, at this time, will be entirely unable to raise. We think it is too pessimistic in this regard. The consensus

of the evidence of the experts is that to enlarge the outlet of the system to a capacity of 20,000 cubic feet would cost approximately $50,000. This, in the aggregate, is a large sum of money. However, when spread by an assessment over 31,000 acres of land, it amounts to about $1.65 an acre. This does not seem to be unduly oppressive, especially when it may be paid in instalments covering a period of years. It must also be remembered that the complaining landowners, whose land will be assessed as 100 per cent. land, will, on their 6,000 acres of land pay 30 per cent. or $15,000 of the cost, leaving but $35,000 to be assessed against the remaining 25,000 acres, being approximately $1.40 an acre.

The method of financing the proposition and the plan for accomplishing the improvement lie within the discretion of the district board. The district court did not, nor will this court, attempt to interfere with this discretion, but the district must act and its acts must be commensurate with its duty.

AFFIRMED AS MODIFIED.