CARL E. FAUGHT, APPELLEE, V. PLATTE VALLEY PUBLIC POWER & IRRIGATION DISTRICT, A CORPORATION, APPELLANT.

25 N. W. 2d 889

FILED JANUARY 31, 1947. No. 32122.

*Crosby & Crosby,* for appellant and cross-appellee.

*Johnson & Kronen,* for appellee and cross-appellant.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEA-GER, CHAPPELL, and WENKE, JJ., and WILSON, District Judge.

WENKE, J.

Carl E. Faught brought this action in the district court for Dawson County against the Platte Valley Public Power and Irrigation District, a corporation.

The purpose of the action was to obtain a mandatory injunction requiring defendant to increase the carrying capacity of the outlet provided under its canal to an extent sufficient to carry off all waters flowing down the draw on plaintiff's land and to obtain a judgment in the amount of $2,653.27 with interest at six percent from March 1, 1943, because of damage to his 1942 crops caused by flooding due to the defendant's negligence in failing to provide such sufficient outlet.

The trial court found that plaintiff's crops had been damaged by flooding to the extent of $1,944.93 because of defendant's negligence in installing an underpass of insufficient capacity to drain off such waters as could and should have been reasonably anticipated to flow down Spring Creek during periods of heavy run-offs, but found that injunction relief should be denied. Judgment was entered thereon for $2,285.13, the additional amount being interest from March 1, 1943, to the date of the judgment, but the mandatory injunction was denied.

Both parties filed motions for new trial and from the overruling thereof the defendant appeals and plaintiff cross-appeals.

For convenience herein the appellant, Platte Valley Public Power and Irrigation District, will be referred to as the district and the appellee, Carl E. Faught, will be referred to as the plaintiff.

This being an equity case, both parties correctly requested that under section 25-1925, R. S. 1943, this court try the case de novo. See Robinson v. Dawson County Irrigation Co., 142 Neb. 811, 8 N. W. 2d 179.

Although the plaintiff leased the land lying east of the draw for the crop season of 1942, however, he had an assignment from the tenant of his interest therein and any question herein of damages relates to the entire crop.

This case involves the same 70-acre tract, canal, and draw as in the case of Faught v. Dawson County Irrigation Co., 146 Neb. 274, 19 N. W. 2d 358, but relates to damages caused by flooding in June 1942, whereas the former case involved floodings of this land in May and June 1940.

There are, however, two distinct changes that occurred in relation thereto after the floodings of 1940 and before the flooding of 1942. In March 1942, the district purchased the canal from the Dawson County Irrigation Company and thereafter, in May and June 1942, increased the size thereof and changed the outlet through the canal. This change resulted in the elimination of the two six-foot spillway openings into the canal which, in case of excess floodwaters, permittted such waters to enter the canal, and of the two underdrains consisting of a concrete box two feet by six feet and a 24-inch pipe. In place thereof the district put in an underdrain 42 inches in diameter at a one-foot lower level and, for some distance below the canal, straightened out the draw to speed up the flow through the underdrain.

With reference to the district, whose canal is immediately south of and adjacent to the plaintiff's 70-acre tract of land and whose canal crosses the draw here involved, we stated its duty in regard to providing an outlet for waters flowing down said draw as follows: "It is the duty of those who build structures across natural drainways to provide for the natural passage through such obstruction of all waters which may be reasonably anticipated to drain there. This is a continuing duty." Faught v. Dawson County Irrigation Co., *supra*.

While it is self-evident that the one 42-inch drain put under the canal in May 1942 does not have the capacity of the two drains that existed thereunder prior thereto; nevertheless, the district offered evidence to show that the two previous drains were partly clogged and that by reason of the increased flow, due to the lowering of the drain and the straightening of the ditch below, the capacity of the outlet to carry off the water was as great.

While there is doubt if this is true, even if it were we would be confronted with the same situation as in our former holding wherein we said: "It appears quite obvious that the underdrains were not adequate to permit the passage of all waters which the defendent should have anticipated might drain there." Faught v. Dawson County Irrigation Co., *supra.* In addition, the floodgates have been removed which were for the purpose of handling any excess.

That this is the situation is established by the evidence. Spring Creek, the draw which crosses the plaintiff's land, has its origin in the Roten Valley some 25 miles to the north in southern Custer County and flows generally south until it empties into the Platte River. On the date of June 19, 1942, and on into June 20, 1942, considerable rain fell in this valley. One and nine-tenths inches fell at Cozad which is about one mile west of the land here involved. This water collected and came down the various draws and creeks in the valley and reached the plaintiff's land sometime Sunday forenoon, June 21. While the draws in this valley overflowed their banks at various places before reaching the old Lincoln Highway, which is north of Noel Cover's land, it there, after passing through two openings and also over the road itself, returned to its channel. It then flowed south through the Noel Cover land. No water reached plaintiff's land except as it came down within the banks of the creek across the Noel Cover land, which is north and immediately adjacent to plaintiff's. It then crossed the plaintiff's land. It there stayed within its banks until it reached the north bank of the district's canal. There

the underpass or drain was insufficient to carry it and it backed up and flowed over its banks onto the plaintiff's lands, both to the east and west thereof. That the underpass, although flowing at capacity, was unable to carry the water coming down the draw seems undisputed. The water came down this draw over a period of two or three days and for that, and a longer period of time, stood backed up on these lands.

We think here, as in our former holding, that the underdrain was not adequate to permit the passage of all waters which the district could and should have anticipated would reasonably drain there. Because thereof the plaintiff's lands were flooded. We find that the district was negligent in installing an underpass of insufficient capacity to drain off such waters.

The district contends that there was other water commingled with the floodwaters which contributed to the damage plaintiff suffered and therefore it was incumbent upon the plaintiff to allocate the damages arising from each of said sources and that no competent proof of such allocation having been shown, the judgment cannot be sustained. See Seibold v. Whipple, 143 Neb. 167, 9 N. W. 2d 154; Snyder v. Platte Valley Public Power & Irrigation District, 140 Neb. 897, 2 N. W. 2d 327; and Robinson v. Central Neb. Public Power & Irrigation District, 146 Neb. 534, 20 N. W. 2d 509.

The application of this rule was properly explained in Faught v. Dawson County Irrigation Co., *supra*, as follows: "Where a substantial amount of water from another source or sources has been added to the water for which defendant is liable, and the combined waters have caused the damage, then it is incumbent upon the plaintiff to establish either that his damages would have occurred from the waters for which defendant is liable, or to establish the amount of his damage that had been caused by the waters for which defendant is liable."

The only evidence that water from any other source could have reached these lands is by surface drainage

from a small area of the Noel Cover land lying just to the west and across a county road. There appears to be two lower areas in the land west of the draw. One area is in the southwest part of this land and is some 2.52 acres in area. The other, some 2.18 acres in area, is farther east and just west of the draw. Prior to May 1942, the 2.52-acre area was drained by a tile extending into the canal and the 2.18 acres by a ditch dug through the bank of the draw. There is evidence that, on occasions other than the time here involved, after heavy rains ponded waters had stood in these areas and there had been surface drainage across this county road toward the east. There is also evidence of water standing on this road during the time of the flood but it is apparent the latter was floodwater that had been backed up by the canal. A rain of 1.9 inches fell in this vicinity on Friday evening, June 19, and .75 inch on Sunday, June 21. These rains do not seem unusual for this vicinity nor does it show they fell suddenly or as washing rains. The top soil of the land is a fine sandy loam and absorbs moisture readily. No previous loss from this source was shown.

From an analysis of the evidence we come to the conclusion that the rains of 1.9 inches on Friday and .75 inch on Sunday did not cause a substantial amount of surface water to drain from the small area of the Noel Cover land onto the plaintiff's land. In fact, it is very doubtful if any water was added from that source and certainly not sufficient to in any way cause damage to the crops growing thereon. As stated in Faught v. Dawson County Irrigation Co., *supra*: "To apply the rule otherwise would make it an instrument by which damage liability would be avoided."

The same is true as to the waters that could have flowed out of the draw and onto the lower area just west of the draw through the ditch leading therefrom. While this area could have gradually been filled up by that means if the draw had run at capacity for some period of time, the fact remains that it was suddenly and completely filled up when

the floodwaters flowed over the banks due to being backed up because of the insufficient underdrain.

It is clear from the evidence that the waters coming down the draw would have continued to flow therein except for the canal of the district and the insufficient opening thereunder; that because thereof the waters were held up and pushed back which caused them to rise, overflow their banks, and flood onto and over the plaintiff's land; that they were thus held back and remained thereon for a period of days causing damage to plaintiff's crops, the extent of which must be herein determined; and that no other waters of any substantial amount in any way contributed thereto.

The plaintiff's claim for damages divides itself into two classifications. The draw, in crossing the 70-acre tract from north to south, divides it into two somewhat equal areas. The area east of the draw, except one acre, was planted to sugar beets. The area west of the draw was in alfalfa which had been seeded in 1941.

Plaintiff's petition alleged that west of the draw he had 33.81 acres of alfalfa of which 11.96 acres were completely destroyed at a loss of $50 per acre and the balance, or 21.85 acres, was 50 percent destroyed at a loss of $25 per acre. In addition thereto he claims a loss to the first cutting, part of which was stacked and part of which was in windrows. This loss he places at $3 per ton on 30 tons of alfalfa in stacks and $4 per ton on 10 tons of alfalfa in windrows.

He alleged that east of the draw he had 26 acres of sugar beets; of this 17 acres was on new alfalfa ground and 9 acres on old alfalfa ground; and that because of the flood the production thereof was reduced a total of 221 tons and as a consequence thereof he was damaged $1,378.92.

Two rules are applicable thereto and were set out in Faught v. Dawson County Irrigation Co., *supra*. They are as follows:

"In case of the destruction of a permanent or perennial crop, such as alfalfa, the measure of damages is the differ-

ence between the value of the land before and after the destruction of the crop."

" 'The determination of the value of the loss of the use of this land can be made almost certain in this case if based upon the evidence of the value of the crop which could have been raised upon this land but for the flood.' " See Gledhill v. State, 123 Neb. 726, 243 N. W. 909.

There is some question raised as to the number of acres in cultivation east of the draw because of an AAA contract for 1942 signed by the plaintiff and his tenant. This shows the area in beets to be 14.7 acres. This contract was used by the sugar beet company as a basis for its computations. However, it seems clear that the figure in this contract must have been in error for a map introduced by the district shows this area to be 26.61 acres and the evidence establishes that it was all in sugar beets except one acre, which was in potatoes. This map also shows the west area to be 32.81 acres. We find the evidence to establish that the plaintiff had 25.61 acres of beets east of the draw, of which 23.4 acres had been blocked and thinned at the time of the flood and that he had 32.81 acres of alfalfa growing west of the draw.

There is considerable evidence offered to show the quality of the soil, its structure, and the depth of the water table. All witnesses seem to agree that for alfalfa a water table of from six to ten feet below the surface is desirable. Also, that if the surface soil is underlaid with a subsoil referred to as "hardpan" that it materially affects its productiveness because the crops planted thereon will either dry out or drown out too easily.

The district offered evidence, including that of witnesses Weakly and Doolittle who had taken test borings with a 1¼-inch auger in November 1945, to show the quality and structure of the soil together with the depth of the water table. These tests show the water table to be as close to the surface as 2.9 feet and that it is very irregular; that the surface soil was a very fine sandy loam which varied ma-

terially in depth; and that parts of the land had a sub-base of hard soil commonly referred to as "hardpan." Other evidence was offered to the same effect.

' On the other hand plaintiff offered evidence of the productiveness of the soil and the nature and quality of the crops he had raised thereon since he became the owner thereof in 1918. He also offered the evidence of Knoedler, who took test borings with a 4-inch auger during the time of the trial. Knoedler testified he found the water table down at about five feet two inches and lower.; that it was quite regular; that the subsoil structure was not hardpan; that under a surface layer of from two to three feet of fine sandy loam he found a gumbo; and that the gumbo was moist all the way down to the water table.

While the matter is in dispute, we think the plaintiff established the land to be of good quality, subirrigated, subject to pump irrigation, and highly productive.

The plaintiff's evidence shows that the alfalfa, seeded in 1941, was a very good stand of which about 20 acres or more had been cut and partly stacked at the time of the flood; that about 30 tons were stacked in three stacks and 10 tons were still in windrows on the ground; that the hay on the ground was totally destroyed and the hay in the stacks damaged; that 11.96 acres were completely destroyed and the balance, or 21.85 acres, was 50 percent lost; that the value of the crop fully destroyed was worth from $50 to $75 per acre and that partially destroyed from $25 to $50 per acre; that the 10 tons in the windrows were worth $4 per ton; and that the 30 tons in the stacks suffered a damage of $3 per ton. The evidence shows that during 1942, on the balance of the alfalfa field which was not completely destroyed, the second, third, and fourth cuttings produced only about half a crop.

The district offered evidence to show that the acreage totally destroyed was much less or about 4 acres; that the balance of the crop was not hurt by the flood but rather due to the nature of the soil upon which it was growing; and

that the value of crop totally destroyed was not over $25 per acre. Much of the district's evidence on this issue seeks to discredit the quality of the land and its productiveness which we have already passed upon.

From the evidence as to the alfalfa, we think it establishes that the plaintiff suffered a loss from the flood-waters as follows:

| | |
|---|---|
| 10 tons of alfalfa hay in windrows, total loss.....$ | 40.00 |
| 30 tons of alfalfa hay in stacks, partial loss........ | 90.00 |
| 11.96 acres of alfalfa, total loss, $40 per acre.... | 478.40 |
| 20.85 acres of alfalfa, partial loss, $20 per acre | 417.00 |

Total loss on alfalfa.......................................$1,025.40

Plaintiff offered evidence to show that at the time of the flood there were 26 acres of beets east of the draw of which 23.4 acres had been blocked and thinned; that it was a good stand; that at the time of the flooding each plant had from four to five leaves; that as a result of the flood the whole stand was reduced about 50 percent, the heaviest loss being at the south and gradually decreasing to the north; that the beets had good care both before and after the flood; that he produced 142 tons from the total acreage; that 17 acres was on new alfalfa ground and 9 acres on beet ground that three years before had been in alfalfa; that an average yield for the year 1942 on the 17 acres of alfalfa ground would have been 15 tons per acre and on the 9 acres it would have been 12 tons per acre; that because of the loss in stand he harvested 221 tons less than he otherwise would have; and that the average loss per ton, giving credit for the value of the tops and deducting the cost of topping and hauling, was $6.33 per ton. Plaintiff supports this by showing yields in 1942 on similar tracts of land which range from 12.3 to 16.5 tons per acre.

The district offered the records of the sugar beet company to show that of the 537 growers it had in Dawson County only 2.75 percent of their acreage averaged 15 tons or better per acre for the year 1942 and that only 21.79

percent of their acreage had 12 tons per acre or better. It also offered evidence of the rainfall, weather conditions, diseases that existed affecting beet culture, and other factors which could influence their growth and development.

It appears that the average tonnage at the Cozad station, to which area this land is adjacent, was 11.2 tons per acre.

We think the evidence establishes that in view of the stand before the flood, the attention given the crop before and after the flood, the loss in stand by the flood, and the average crop raised by others on similar land, the plaintiff had a loss of 50 percent due to the floodwaters or a total of 142 tons. Computed at $6.33 per ton this makes a loss of $898.86.

The record is long and we have not attempted to set out the evidence in detail. It is in conflict on many questions. Our findings are based on what we have concluded the evidence establishes. We find plaintiff's total damage to be $1,924.26 to which interest should be added at six percent from March 1, 1943.

By his cross-appeal the plaintiff claims the court erred in the denial of his prayer for a mandatory injunction. As already stated the plaintiff had prayed for an order requiring the district to increase the carrying capacity of the outlet provided through its canal to an extent sufficient to carry off all waters that could reasonably be anticipated to flow down Spring Creek.

The district's duty in this regard is to provide an outlet through its canal sufficient for the natural passage of all waters which could reasonably be anticipated to drain there.

We have said in Gering Irrigation District v. Mitchell Irrigation District, 141 Neb. 344, 3 N. W. 2d 566: "* * * a party seeking an injunction must establish by competent evidence every controverted fact necessary to entitle it to relief, an injunction will not lie unless the right is clear, the damage is irreparable and the remedy at law is inadequate to prevent a failure of justice."

"Ordinarily, to warrant injunctive relief, it must clearly appear that some act has been done, or is threatened, which will produce irreparable injury to the party asking for such relief." 43 C. J. S., Injunctions, § 23a, p. 446.

"Acts which destroy or result in a serious change of property either physically or in the character in which it has been held or enjoyed have been held to do an irreparable injury." 43 C. J. S., Injunctions, § 23b (2), p. 448.

"As a general rule, where an injury committed by one against another is continuous or is being constantly repeated, so that complainant's remedy at law requires the bringing of successive actions, that remedy is inadequate and the injury will be prevented by injunction. The fact that an injured person has the right of successive actions for the continuance of the wrong does not make it an adequate remedy at law which bars the jurisdiction of a court of equity to grant in injunction to restrain the continuance of the injury." 43 C. J. S., Injunctions, § 24a, p. 449.

As stated in Hackney v. McIninch, 79 Neb. 128, 112 N. W. 296: "It is now well settled that injunction is a proper remedy, particularly when, as in this case, the injury is of a continuous nature and committed under a claim which indicates a continuance or frequent and constant repetition of it. Courts of equity take cognizance of these cases to prevent the vexation and harassment of continued disturbances, prevent a multiplicity of suits, and to preserve the right by restraining the commission and repetition of threatened injury. Pohlman v. Trinity Church, 60 Neb. 364; Carroll v. Campbell, 108 Mo. 550." See, also, Hagadone v. Dawson County Irrigation Co., 136 Neb. 258, 285 N. W. 600; Mooney v. Drainage District, 126 Neb. 219, 252 N. W. 910.

The evidence clearly establishes that the passage provided through the canal in 1940 was inadequate to carry the water that could reasonably be anticipated to drain there; that the same was true after the change in 1942, if not more so; that if a sufficient passage or drain is provided

to carry the waters naturally flowing there that it will drain on down the draw and not create any additional burden of floodwaters on the lands south of the canal; that the lands here involved, because of the inadequate underdrains, have been flooded in 1940 and 1942; that they were again flooded in 1945; that actions for damages arising out of the floods in 1940 and 1942 were instituted, appealed to this court, and sustained; that such an action has been instituted for damages arising out of the flood which occurred in 1945; that such flooding materially and permanently affects the surface soils and has the effect of causing such soils to become hard and much less productive; that the uncertainty of harvesting a crop, because of the possibility of a flood and having a claim for damages in lieu thereof, has made the land less desirable and tenants hard to obtain; that because thereof it is becoming much less valuable.

We think the evidence clearly establishes the plaintiff's right to the injunctive relief for which he prayed.

It is therefore ordered that the judgment of the lower court be modified and that plaintiff have judgment for $1,924.26 with interest at six percent from March 1, 1943, and that he be granted the injunctive relief for which he prayed. Costs are taxed to the district. As modified the judgment of the lower court is affirmed.

AFFIRMED.