Harold McGill et al., Appellants, v. Card-Adams Company, a corporation, et al., Appellees.

47 N. W. 2d 912

Filed May 17, 1951.   No. 32892.

*William L. Walker* and *Earl Ludlam*, for appellants.

*Roy F. Gilkeson, Hymen Rosenberg,* and *Merril R. Reller,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

Plaintiffs brought this action in equity seeking a mandatory injunction requiring the removal of certain dams and obstructions in an alleged watercourse on defendants' land and requiring its restoration to its natural course and condition, and enjoining any future changes therein. Defendants joined issue and prayed for a dismissal of plaintiffs' petition. Defendants by cross-petition sought a mandatory injunction requiring the plaintiffs to fill in ditches and remove dikes on plaintiffs' land and to restore it to the condition prevailing in 1945, and sought damages. Plaintiffs replied to the

answer, and answered the cross-petition and prayed for its dismissal. Trial was had resulting in a decree granting plaintiffs substantial relief against defendants, and granting defendants substantial relief against plaintiffs and awarding damages. From this judgment plaintiffs appeal challenging the correctness of the judgment against them and also the sufficiency of the decree granting plaintiffs relief against defendants, and in particular that part of the decree requiring the defendants to remove all dams and dikes erected by them on their own land "since 1948." Defendants do not cross-appeal.

We try the cause de novo here and reverse the judgment and remand the cause with directions.

Plaintiffs are the owners as tenants in common of a quarter section of land in Lancaster County. The wife of one of the plaintiffs is joined. They purchased the land in 1945. Defendants are a corporation, the owner of land involved herein, and two of its officers. They will be referred to herein as plaintiffs and defendant or, where required, as defendants.

Trying this case de novo, we state largely the conclusions of fact which we reach from the evidence.

We state these conclusions in the light of the provisions of section 31-202, R. S. 1943, that "Any depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse"; and our holdings in Courter v. Maloley, 152 Neb. 476, 41 N. W. 2d 732, that "* * * to constitute a watercourse the size of a stream is not material. It must, however, be a stream in fact, as distinguished from mere surface drainage occasioned by freshets or other extraordinary causes, but the flow of water need not be continuous" and "The flood plane of a watercourse is regarded as a part of the channel and the water flowing within the channel or its flood plane is characterized as floodwater."

Plaintiffs and defendant own adjoining quarter sec-

tions of land. Plaintiffs' land is in Lancaster County
and to the west of defendant's land which is in Cass
County. These lands are relatively level, being in the
basin of a watercourse. Some 1,900 acres of land drained
in a state of nature into and across plaintiffs' lands and
then defendant's land. The ditches and normal-flow
channels referred to herein are shallow; the dikes re-
ferred to are low structures. There was a watercourse
coming onto the plaintiffs' land at the northeast corner
thereof and going south, one to the west thereof and
going south. The northwest corner of plaintiffs' land
is 9 feet higher than the center and east part. There
was a watercourse coming from the northwest entering
near the northwest corner and going southeast. There
was another watercourse coming from the west, going
east through relatively level land, and one coming from
the south and going northeast. The west one (of the
watercourses from the north), and the ones from the
northwest, west, and south finally reached a relatively
level area in the center of plaintiffs' land, where they
spread out, but finally went in a watercourse to the
east and across defendant's land and emptied into Salt
Creek to the east. The watercourse from the northeast
corner apparently went due south and emptied into the
course to the east. Floodwaters coming down across
plaintiffs' land spread out over a considerable area in
width, forming at times, when receding, one large
shallow body of water about the center of plaintiffs'
land and a smaller one to the northeast. The evidence
is that a large part of the surface soil on both pieces
of land was built up by deposits so put on the land. In
addition to rain and melting snow run-off there were
springs in the area to the west and northwest that
supplied an undetermined but probably small amount
of water to these courses. It also appears that naturally
floodwaters spread out on both pieces of land and either
drained off or finally percolated or evaporated from the
lands. There was probably a longer period of ponded

waters on plaintiffs' land. Such appears to have been the natural situation.

In 1906, if not before, there was a road along the north side of plaintiffs' land and also along the east side between plaintiffs' and defendant's land. There was a bridge across the road between the two pieces of land under which the normal-flow channel passed from plaintiffs' to defendant's land. Ditches along the sides of these roads carried water first east and then south to the bridge and it appears that the east watercourse from the north became merged with the road ditch. In 1906, the then occupant of plaintiffs' land either cleaned out or made these road ditches and cleaned out and straightened the normal-flow channel running from the bridge west in a Y-shaped manner, so as to bring the water from the south, west, and northwest more directly to the bridge and drain the low area in the center. At that time there was a well-defined meandering normal-flow channel with grassed banks from the bridge east across the defendant's land to Salt Creek. In that condition, floodwaters coming down from the west would escape under the bridge or, in time of greater floods, flow over the road north of the bridge onto defendant's land and ultimately into Salt Creek.

In 1937, Cass County raised the grade of the road and put in a longer and higher bridge. The grade was again raised in 1941. The ditches along the road furnished the dirt used in the elevation of the road. After 1937, floodwaters were held by the road and the only means of escape was under the bridge.

Also in 1937, the then occupant of plaintiffs' lands cleaned out the older ditches and made a smaller ditch leading from the depression in the northeast to the bridge. Prior to 1937, defendant had done some work keeping the normal-flow channel open on its land. In 1937, defendant widened and straightened the channel east of the bridge until it emptied into a deeper channel leading to Salt Creek. This was done again in 1941.

In its own language this ditch of defendant was "only large enough to carry our own water."

In 1945, plaintiffs cleaned out, straightened, and enlarged the old ditches on their land.

In 1946 and thereafter, they extended some of these ditches, changed the course of the one from the northwest so as to come more directly east, and generally bettered the drainage system. Either in 1946 or 1947, they further cleaned out the ditches, made low dikes along the north and east courses so as to better confine the waters in those road ditches, ran the watercourse from the west one of the north courses more directly south, and built a dike along the east side of it to confine waters to the channel. They also made a dike along the south side of the channel coming from the northwest so as to direct waters in that course more directly to the east. They built a "twin" ditch coming in from the southwest and also one from the northeast where there had been single ditches prior thereto. In part these improvements were made on plans of soil conservation officials of the United States Department of Agriculture.

With the exception of the road ditch from the north, these drainage ditches all converged on plaintiffs' land west of the fence line at the bridge. The road ditch joined at the west side of the bridge. In 1945, there was an elevation of land defined as a "rim" across the plaintiffs' land west of the bridge. Its elevation above the land to the west is not shown. In their operations in 1946 or 1947, plaintiffs removed some of this rim and moved it out into their fields to the west. There is no evidence as to the width, length, or depth of the area so changed.

Defendant by cross-petition seeks to compel the removal of the structures made by plaintiffs and prays that they be required to restore their land "to the same condition prevailing at the time" they purchased the land in 1945.

One witness fixed the depth of the large lake at one time at one place at 20 inches. With that exception, the evidence shows no definiteness as to depth or area of the waters referred to variously as "lakes" and "ponds" on plaintiffs' land. Some witnesses describe them as covering a large area, some a fraction of an acre, depending in part on the year or time of year they were observed. More important, there is no evidence as to the water capacity of these lakes or ponds or of the quantity of water drained from the lakes or ponds by plaintiffs' works. Nor is there any evidence that the waters so drained at any time exceeded the capacity of the normal channel of the watercourse on defendant's land. The defendant by its works had made it difficult, if not impossible, to furnish such evidence. The evidence negatives any finding that the construction of the plaintiffs had any appreciable adverse effect upon the volume or flow of water at floodtimes. There is undisputed evidence of one expert witness that plaintiffs' works would be of benefit in floodtimes by carrying off more quickly the initial floodwaters. There is evidence of defendant's engineer that plaintiffs' construction "accelerated the flow and affected pondage to some extent." The evidence negatives a conclusion that it had that effect of accelerating the flow in periods of excessive floods. It is also patent that the roadway embankment retarded the flow of floodwaters upon defendant's land and restricted that flow to the capacity of the bridge outlet. It is also patent that the plaintiffs' works did not add any water to the quantity of water in the drainage basin.

By 1945, defendant's ditch east of the bridge had begun to fill with silt and debris. Defendant did nothing to keep it open. It was largely filled by 1948. In October of that year defendant built a dam across the channel immediately east of the bridge so as to prevent any water flowing from plaintiffs' land until the water reached a level above the level of the land on either

side. It had that purpose and effect of holding the normal-flow waters on plaintiffs' land. Defendant also began down àt the deep channel on its own land and built a new ditch to the north of the old channel and in a more direct line toward the bridge. It then built two dikes, one from the northwest and one from the southwest, converging on the new ditch and designed to catch all floodwaters, or waters passing around the smaller dike at the fence and carry them down the new ditch to Salt Creek and prevent them from spreading out and flowing on its land, as floodwaters had previously done. It had the effect of holding back floodwaters on the plaintiffs' land similar to the effect of the road grade. Defendant then leveled off the land where the 1941 channel had been. Plaintiffs' petition is to require the defendant to remove these dams and dikes, and to restore the watercourse so as to permit the water to flow at normal or floodtime as it had formerly done.

Defendant claimed damages for the years 1945, 1947, 1948, and 1949, which it asserts were proximately caused by plaintiffs' works. The area involved where damage to crops occurred was in the flat lands on either side of the normal-course channel and within the flood channel where the water always spread out in time of floods, and some remained to drain off, evaporate, or percolate away.

In 1945, the floods occurred after periods of rain on the defendant's land and after rainwaters draining down the watershed came down across the plaintiffs' land under the bridge and spread out on defendant's land. In short, it was caused by floodwaters which "spread away" from defendant's 1941 ditch out onto defendant's land and "lay there." It is to be noted that in this period, so far as we can determine, either plaintiffs' construction work had not been done or had not progressed beyond plowing out the older ditches.

In 1946, defendant claimed no damages because that year "it rained just right"; there was not a "particle

of runoff" either on plaintiffs' land or defendant's land; there was "no movement of water." In short, there were no floods in 1946.

In 1947, the same situation happened as in 1945. Following rains, water stood on the plaintiffs' and defendant's land.

In 1948, water "came out of the hills and down the McGill ditch" when a 22-inch snow melted in March, spread out over defendant's land, froze there, and killed out a wheat crop. The flood was caused by water "* * * accelerated from the hills and concentrated at the bridge at bridge capacity *and flowed onto our land to a way greater extent than our ditch could carry it"* (emphasis supplied); "* * * the water was roaring down there and slush and snow faster than the bridge could take it, flooding their land, flooding ours."

In 1949, there was "heavy rainfall" and like floods, so much so that at one time water ran around the south end of defendant's Y dike and out onto its lands, finally cutting through the dike itself near the location of the old ditch.

The above is a sufficient summary of the evidence and the conclusions from it to enable a decision of the issues presented.

We take up first the matter of plaintiffs' right to relief against the defendants.

The rules applicable have been repeatedly stated by us.

"It is the duty of those who build structures across natural drainways to provide for the natural passage through such obstruction of all waters which may be reasonably anticipated to drain there. This is a continuing duty.

"A stream which is accustomed to extend itself beyond its banks in times of high water and to flow over the adjacent lands in its flood plane in a broader stream, retains its character as a live stream, and the law relating to floodwaters applies.

"The flood channel must be considered as a part of the channel of the stream and no structures or other obstructions can be placed in its bed which will have a tendency to dam the water back upon the property of upper riparian or adjacent owners.

"The owners or proprietors of lands bordering upon either the normal or flood channels of a natural watercourse are entitled to have its water, whether within its banks or in its flood channel, run as it is wont to run according to natural drainage, and no one has the lawful right by diversions or obstructions to interfere with its accustomed flow to the damage of another." Beetison v. Ballou, 153 Neb. 360, 44 N. W. 2d 721.

"Where surface water resulting from rain and snow flows in a well-defined course, whether it be a ditch, swale, or draw in its primitive condition, its flow cannot be arrested or interfered with by a landowner to the injury of neighboring proprietors.

"For such an injury injunction is the proper remedy, and equity looks to the nature of the injury inflicted, together with the fact of its constant repetition, or continuation, rather than to the magnitude of the damage inflicted, as the ground of affording relief." Schomberg v. Kuther, 153 Neb. 413, 45 N. W. 2d 129.

"* * * the upper owner of land has the right, without interference, to have the flow of surface water follow along a well-defined watercourse from his land." Jorgenson v. Stephens, 143 Neb. 528, 10 N. W. 2d 337.

Plaintiffs are entitled to injunctive relief. The cause is remanded with directions to grant plaintiffs injunctive relief in accord with the above rules requiring the defendant to remove its dikes and dams constructed in 1948, and to restore a natural watercourse through its land.

We next take up the matter of defendant's right to relief against the works of the plaintiffs.

Section 31-201, R. S. 1943, provides: "Owners of land may drain the same in the general course of natural

drainage by constructing an open ditch or tile drain, discharging the water therefrom into any natural watercourse or into any natural depression or draw, whereby such water may be carried into some natural watercourse; and when such drain or ditch is wholly on the owner's land, he shall not be liable in damages therefor to any person or corporation."

The rule is: "By virtue of section 31-201, R. S. 1943, an owner of land may, without liability in damages, drain the same in the general course of natural drainage by constructing and maintaining in a reasonable and proper manner, and wholly on his own land, an open ditch or tile drain, discharging a reasonable quantity of water therefrom into a natural watercourse upon his own land or into a natural drainway thereon, whereby such water may be carried into some natural watercourse." Halligan v. Elander, 147 Neb. 709, 25 N. W. 2d 13.

We do not undertake here to review all our decisions resulting from the varied fact situations that these drainage cases present. Because defendant's position on its cross-petition is not better than the fact situations there presented, we cite the cases of Todd v. York County, 72 Neb. 207, 100 N. W. 299, 66 L. R. A. 561; and Aldritt v. Fleischauer, 74 Neb. 66, 103 N. W. 1084, 70 L. R. A. 301, where the reasons for the rule and the authorities are discussed. There injunctive relief was denied to the plaintiffs. We have repeatedly followed these decisions. We do so again.

As to the right of defendant to recover damages, the rule is: "Where a substantial amount of water from another source or sources has been added to the water for which defendant is liable and the combined waters have caused the damage, then it is incumbent upon the plaintiff to establish either that his damages would have occurred from the waters for which defendant is liable, or to establish the amount of his damage that had been caused by the waters for which defendant is liable."

Faught v. Platte Valley Public Power & Irrigation District, 147 Neb. 1032, 25 N. W. 2d 889.

There is no attempt made in the present record to make such an allocation of damages. In fact, there is no evidence from which it can be found that any of defendant's damage was caused by plaintiffs' construction. It is patent that defendant's damage was caused substantially by heavy floodwaters and was not proximately caused or contributed to by the construction of the drainage system of plaintiffs. If anything, it was contributed to by its own works in changing the normal-flow channel. It is quite apparent from defendant's testimony that its lands would have been flooded whether or not the works of plaintiffs were there. Defendant is not entitled to recover damages. The cause is accordingly remanded with directions to deny relief to the defendant on its cross-petition.

All costs are to be taxed to defendant.

REVERSED AND REMANDED WITH DIRECTIONS.