JOHN BAUM, APPELLANT, V. THE COUNTY OF SCOTTS BLUFF,
NEBRASKA, A CORPORATION, ET AL., APPELLEES.

109 N. W. 2d 295

Filed May 19, 1961. No. 34900.

*Holtorf, Hansen & Fitzke,* for appellant.

*W. H. Kirwin, Wright & Simmons,* and *James R. Hancock,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

The plaintiff, John Baum, brought this action against the County of Scotts Bluff and the Gering-Fort Laramie Irrigation District to recover damages to growing crops and personal property alleged to have resulted from floodwaters caused by a structure jointly constructed by the County of Scotts Bluff and the Gering-Fort Laramie Irrigation District in the district's drainage ditch. This appeal involves the second trial of this action. Our first opinion appears in Baum v. County of Scotts Bluff, 169 Neb. 816, 101 N. W. 2d 455.

The trial court, in instruction No. 7 in the second trial, instructed the jury as follows: "Your determination of the facts in issue in this case will be shown by your answers to Special Findings. It will be necessary for you to give your answers to the findings in the order of their numbers, bearing in mind all of the law set out in these instructions.

"The various questions which you will be required to answer as your Special Findings of fact are stated as follows:

"1. Has the plaintiff sustained the burden of proving by a preponderance of the evidence that the opening in the structure placed in the drainage ditch by the defendants was too small to carry the water and debris that could reasonably be expected to come down said ditch in times of heavy rainfall? Answer yes or no. ——

"(If your answer to No. 1 is 'No' you will go no further but return this as your verdict. If your answer to No. 1 is 'Yes' you will then answer Questions Nos. 2 through 5.)"

The jury answered question No. 1 "No" and returned its verdict accordingly, which verdict was accepted by the trial court. Judgment was rendered on the verdict dismissing the plaintiff's action. The plaintiff filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. This motion was overruled. The plaintiff perfected appeal to this court.

The Gering-Fort Laramie Irrigation District is a governmental subdivision organized to furnish irrigation water to privately owned lands within the district and to provide drainage for such lands resulting from seepage and surface waters. It is organized for a public purpose. The county of Scotts Bluff is likewise a governmental subdivision charged with the statutory duty of building and maintaining highways and bridges for public use. In so doing it is engaged in carrying out a public purpose.

The plaintiff was a tenant farmer on the southeast quarter of Section 21, Township 21 North, Range 55 West of the Sixth P. M., in Scotts Bluff County, which will hereafter be referred to as plaintiff's farm. There is a county road which runs north and south, and a county road which runs east and west past the plaintiff's farm. A little east of the center of the plaintiff's south line, the district's drainage ditch crossed to the north under a county bridge on the highway onto plaintiff's land, continued in a diagonal course to the northeast to about the center of plaintiff's east line, and then continued in a northerly direction. The ditch was crossed by a beet spur railroad track approximately 100 feet north of the highway bridge. In 1957, the county and district jointly constructed a single row of steel sheet piling across the ditch about 50 feet north of the highway bridge. The purpose of the district in assisting in the

building of this structure was to stop the ditch from washing wider and deeper by retarding the flow of water. The purpose of the county in assisting in its construction was to prevent the washing out of the approach to the east end of the highway bridge.

The plaintiff testified that on June 1, 1958, there was a heavy rain at Gering, and when he arrived home it was still raining. The water was around his house, almost up to the door. The cattle corral was full of water. The water started to run through his farm about 5 or 5:30 p.m. The water was coming from the structure, and was running around both the east and west sides of the structure. Very little water was going through the opening in the structure because the opening was closed up with debris which came down the drainage ditch. The water was running fast, and was 24 or 25 inches deep running through his farmyard. North of the structure there was very little water, but south of the structure it formed a reservoir. There was no water on his farm coming from any direction other than from the structure. There was a steel culvert between the structure and the bridge, the purpose of which was to catch water that would come down the county road from the west and let this water go into the drain. On June 8, 1958, the same thing occurred as did on June 1. The structure was plugged up again. It started to rain, and in 45 minutes the water started to run on his land. He observed the water coming on his land from the structure. The water in the drainage ditch was backed up south of the structure and formed a reservoir. The water was overrunning the drainage ditch, and it ran in the same course on June 8 as it did on June 1. There was no water coming on his land from any source other than the water by the structure. The plaintiff further testified that on June 1, 1958, he received 1¾ inches of rain, and on June 8, he received 2¼ inches of rain. He further testified that he had received 4¾ inches of rain at one time in 1947; that on

July 18, 1957, he received 3¾ inches of rain; in 1951 he received 3¼ or 3½ inches of rain at one time; and that during the years 1947, 1951, and 1957 the drainage ditch did not overflow.

A witness who resides 1 mile south and 1½ miles west of the plaintiff's farm testified that on June 1, 1958, he stopped at the plaintiff's farm and observed the plaintiff standing in water which was about 2 feet deep and was running to the northeast. After he left the plaintiff's farm he traveled south and passed the intersection of the two county roads. He then looked to the west and observed that the water was coming from the drainage ditch south of the obstruction. He observed the ditch at the next section corner south of the plaintiff's farm and it had not broken its banks. There was no water flowing across the half section of land south of the plaintiff's farm. The borrow pits were not full of water. On June 1, 1958, he received 1.4 inches of rain. He further testified that he had received rainfalls of the same size previously.

A witness who lived 1 mile south and 1⅛ miles west of plaintiff's farm testified that he was at the plaintiff's farm between 6 and 6:30 p.m. on June 1, 1958. At that time there was water and debris flowing northeast through the plaintiff's yard and corrals. After leaving the plaintiff's farm he traveled south. When he reached the intersection south of the plaintiff's farm he looked to the west and observed water coming from the drain. On June 1, 1958, he received 1½ inches of rain. He further testified that he had seen other rains of that size since he lived on his farm. On the way to his farm he observed other drains and they were not running over.

A Standard Oil agent from Scottsbluff testified that on June 1, 1958, at about 6 p.m., he was at the plaintiff's farm. He observed water running through the plaintiff's yard and corrals. This water was coming from

the drainage ditch, and any water coming from the south was running toward the east.

A civil engineer and surveyor with considerable experience as an engineer in irrigation and drainage work testified that in 1957 he designed a structure in the drainage ditch near the plaintiff's farm; that in designing this structure it was necessary to know the amount of water that might reasonably be expected to pass through the structure; and that he was familiar with the drainage system of the irrigation district in the area involved in this litigation. He further testified that the reason the structure was placed in the drainage ditch was because the rains previous to that time washed out the east approach to the bridge. He desired to so build the structure that it would dispense with the erosion at the bridge as it had done previous to the building of the structure. He further testified that it was bad business to have a drainage ditch make a right-angle turn, as had to be done to get under the bridge, and with the velocity of water it was hard to maintain anything on the east side of the bridge, consequently, he put the steel-sheet piling as a drop to correct this difficulty and trouble; that the opening in this structure he believed to be about 12 feet wide and 7 or 8 feet deep; that the opening in the structure was about 3 or 4 feet above the bottom of the ditch; that the reason the opening in the structure did not need to be as large as the ditch was that the water falling over the piling and having room to drop down would gather velocity and that would require a considerably smaller area than the ditch back of the structure; and that the opening was more than sufficient to take care of the water that came down through the ditch.

A witness testified that in the evening of June 1, 1958, he went to where the structure was located. He observed that there was water running down the road south of the plaintiff's farm. There were two cotton-wood trees, more than a foot in diameter, that had been

cut down by the Consumers Public Power District about 2 years previously and left on the side of the bank, and these trees had become stuck crosswise in the structure. By the use of a rod, he pried them loose. After he succeeded in removing the trees, the structure seemed to take all water that would flow through it without any difficulty. This witness further testified that on June 1, 1958, there was water running across the Schwindt place located about half a mile south of the structure. This water was running through the field and spread over the Schwindt farm. About one-eighth of the Schwindt farm on the east side of the ditch was under water. Some of the water from the Schwindt farm ran down onto the plaintiff's farm. This witness testified that there was water in the borrow pit along the road going south from the plaintiff's farm. A part of this water came down to the corner and then went onto the plaintiff's farm, including the water from the structure. This witness further testified that there were three different places that the water collected on the plaintiff's farm was coming from; that on June 8, 1958, there was water all over; that all of the Schwindt farm was under water; and that this water would flow to the north on the road, then to the plaintiff's farm. This witness further testified that the dam, which is located approximately 2 miles south of the plaintiff's farm, went out at about 5 minutes after 9 p.m., on June 8, 1958. All of the water released by the dam flooded to the north. Because of this, he was unable to go down the road north to the plaintiff's land. He testified that a considerable amount of water ran down the north road. This witness further testified that on June 1, 1958, water did not go out of the drain ditch on the west side of the structure.

A witness testified that he was near the intersection southeast of the plaintiff's farm on June 1, 1958; that he observed that the intersection was covered with water; and that there was water in the field southwest

of the plaintiff's farm and nearly as far as one could see to the south.

A director of the irrigation district testified that a day or two after June 1, 1958, he was at a place a mile south of the plaintiff's farm. He observed that the north bank of the drainage ditch had been washed away, and 3 or 4 feet had been washed off the top for a distance of probably 100 to 150 feet.

The engineer who designed the structure further testified that the road running south from the plaintiff's corner sloped to the north with a fall of 39.4 feet in a mile; and that water escaping from the drainage ditch a mile south of the plaintiff's farm would travel north, and part of this water would stay in the road borrow pits and part of it would run to the west then would run back to the southeast corner of the plaintiff's farm. He further testified that he was at the site of the structure on June 2, 1958, and examined the county road from the bridge on west; that there was considerable erosion from the section corner west of the bridge to the bridge; that there was washing in the north borrow pit of the road for quite a distance; that there was quite a bit of washing between the county road and the railroad right-of-way; and that water had crossed the railroad tracks at three different places which he discerned by deposits of debris on the tracks. He further testified that there had been no water going over the tracks at or near the railroad bridge for several hundred feet on either side.

A witness who lived approximately a mile and a half south of the plaintiff's farm testified that on June 8, 1958, there occurred the heaviest rain he had ever seen in that area where he had lived for 30 years. He also testified that he had never seen so much water run into the drainage ditch.

Another witness testified that he lived south and east of the plaintiff's farm in the same drainage area, and had lived there for a period of 40 years; and that on June 8, 1958, in the area there was a "regular flood,

wash out or cloud burst." He measured the rain at one time and found it to be 2½ inches. He believed the rain had ceased, but it started to rain again. He again measured the rain and found it to be 3½ inches, or a total of 6 inches. During the 40 years he had lived in that area, he did not recall a rain of that size.

A witness who lived in the same drainage area south and west of the plaintiff's farm testified that on June 1, 1958, there were probably about 5 inches of rain. He had lived in that area all of his life, for 51 years. He further testified that on June 8, 1958, there was a flood, and he measured the rain and found it to be about 7 inches. He further testified that he had never seen a rain of such proportions since around 1922 or 1923.

A witness who had lived in the drainage area and to the south and west of the plaintiff's farm since 1927 on a branch of the drainage which is called Little Cedar Creek, testified that on June 8, 1958, this creek overflowed to the east, and looked more like a river than a creek. This witness further testified that from a point one-eighth of a mile southwest of his house, all along the east as far as he could see, Little Cedar Creek was overflowing; and that in 1947 and 1948 this creek overflowed but not to the extent that it did on June 8, 1958, when there was the largest amount of water he had seen in Little Cedar Creek.

The plaintiff contends that the verdict is not sustained by the evidence. From a review of the evidence, there is no question but that it is sufficient to submit the case to the jury. See Baum v. County of Scotts Bluff, supra.

The question then arises, is the verdict contrary to the law? In this connection, the plaintiff cites Walla v. Oak Creek Township, 167 Neb. 225, 92 N. W. 2d 542, wherein this court said: " 'Where water, be it surface water, the result of rain or snow, or the water of springs, flows in a well-defined course, be it ditch or swale or draw in its primitive condition, and seeks its discharge

in a neighboring stream, its flow cannot be arrested or interfered with by a landowner to the injury of the neighboring proprietors, and what a private proprietor may not do neither can the public authorities, except in the exercise of the right of eminent domain.' Roe v. Howard County, 75 Neb. 448, 106 N. W. 587, 5 L. R. A. N. S. 831." The court also held: "It is the duty of those who build structures across natural drainways to provide for the natural passage through such obstructions of all waters which may be reasonably anticipated to drain there." There are several cases to this effect which need not be cited.

The contention of the plaintiff is that in the light of cases cited, the defendants have a duty, not only to provide an adequate opening, but also have a duty not to arrest or interfere with the waters flowing in the drainage ditch; and that the court failed to instruct on this duty owed by the defendants, even though the plaintiff requested instructions on this point.

In Baum v. County of Scotts Bluff, *supra,* this court held: "While one who obstructs the flow of a drainage ditch in the furtherance of a public purpose is liable for damages thereby caused by the flooding of the lands of another, the burden of proof is on the latter to prove the obstruction, that there was an overflow, that the overflow would not have occurred if it were not for the obstruction, and the extent of the damage attributable to it. * * * One who builds a structure in a drainage ditch is charged with a duty to provide for the passage of all waters, ice, and debris which may reasonably be anticipated to flow or be carried through the ditch."

The law announced in Baum v. County of Scotts Bluff, *supra,* as heretofore stated, is the law in this case. This being true, the plaintiff's requested instructions were properly refused.

Some objection is made by the plaintiff to the fact that the evidence is insufficient to submit to the jury the instruction covering the defendants' defense that

the floods complained of by the plaintiff resulted from an act of God. We will not repeat this evidence which has heretofore been set forth.

In Cover v. Platte Valley Public Power & Irr. Dist., 162 Neb. 146, 75 N. W. 2d 661, this court said: "In order for a flood to come within the term act of God, it must have been so unusual and extraordinary a manifestation of nature as could not under normal conditions have been reasonably anticipated or expected. * * * An act of God does not necessarily mean an operation of natural forces so violent and unexpected that no human foresight or skill could possibly have prevented its effect. It is enough that the flooding should be such as human foresight could not be reasonably expected to anticipate and whether it comes within this description is ordinarily a question of fact."

Suffice it is to say that the evidence in this case is sufficient to submit the defense of an act of God to the jury.

The plaintiff tendered instructions on this issue which the trial court refused. We hold that the trial court did not commit prejudicial error by refusing plaintiff's tendered instructions.

The plaintiff contends that instruction No. 11 given by the trial court was prejudicially erroneous.

Instruction No. 11 instructed the jury that the plaintiff must not only prove that the structure involved was not large enough to accommodate all of the water that could reasonably be expected to come down the ditch, but also that the inadequate size of the opening in the structure was the proximate cause of the damages sustained by the plaintiff. The plaintiff's contention is that this instruction placed too great a burden on the plaintiff, because it required the plaintiff to prove that the inadequate size of the opening in the structure was *the* proximate cause of the damages sustained by him; that all the plaintiff needed to prove was that the structure arrested the flow of the water or inter-

fered with it; and that in any event, under certain circumstances the plaintiff's burden of proof would only require that he prove that the structure, either by arresting the flow or by an inadequate opening, was *a* proximate cause.

In the instant case the plaintiff alleges that his damages occurred by reason of one cause, the placing of the structure in the drainage ditch. The plaintiff was entitled to recover only if this structure caused damage to him. The plaintiff would not be entitled to recover damages done by water from sources other than from the structure. The plaintiff has the burden of showing that all the damages he sustained resulted from one cause. The overflow of the structure would be the proximate cause of the damage if the plaintiff proved his cause of action as pleaded.

In Mohatt v. Olson, 146 Neb. 764, 21 N. W. 2d 516, this court said: "Where a substantial amount of water from another source or sources has been added to the water for which defendant is liable, and combined waters have caused the damage, then it is incumbent upon the plaintiff to establish either that his damages would have occurred from the waters for which defendant is liable, or to establish the amount of his damage that had been caused by the waters for which defendant is liable." See, also, McGill v. Card-Adams Co., 154 Neb. 332, 47 N. W. 2d 912; Faught v. Platte Valley Public Power & Irr. Dist., 147 Neb. 1032, 25 N. W. 2d 889.

The evidence discloses that there was a substantial amount of water that came from sources other than the structure. This evidence does not seem to have been contradicted or denied. Under the circumstances, we conclude that the trial court did not err in the giving of instruction No. 11.

We have heretofore set forth instruction No. 7 given by the trial court. The plaintiff contends that the trial court erred in giving instruction No. 7 for the reason

that he was entitled to have the jury return a general verdict.

Section 25-1120, R. R. S. 1943, provides: "When the special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court may give judgment accordingly."

Section 25-1121, R. R. S. 1943, provides: "In every action for the recovery of money only, or specific real property, the jury, in their discretion, may render a general or special verdict. In all other cases the court may direct the jury to find a special verdict, in writing, upon all or any of the issues; and in all cases may instruct them, if they render a general verdict, to find upon particular questions of fact to be stated in writing, and may direct a written finding thereon. The special verdict or finding must be filed with the clerk and entered on the journal."

Section 25-1122, R. R. S. 1943, provides: "The verdict of a jury is either general or special. A general verdict is that by which they pronounce, generally, upon all or any of the issues either in favor of the plaintiff or defendant. A special verdict is that by which the jury finds the facts only. It must present the facts as established by the evidence, and not the evidence to prove them; and they must be so presented that nothing remains to the court but to draw from them conclusions of law."

In the case at bar, under the pleadings and under the instructions, the only issue was whether or not the structure placed in the drainage ditch was of sufficient size to carry all of the water which could reasonably be expected to come down the drainage ditch in times of heavy rainfall. If the structure was too small or of insufficient size to carry all of the water which could reasonably be expected to come down the drainage ditch, then the plaintiff would be entitled to recover. On the other hand, if the structure was sufficiently large to carry all the water which could reasonably be expected

to come down the drainage ditch in times of heavy rainfall, then the defendants would be entitled to recover. When this issue was decided by the jury there was nothing further for it to consider. The jury, under instruction No. 7, must certainly have known the issue involved, and it decided this issue against the plaintiff. The verdict in reality had the effect of a general verdict as defined by section 25-1122, R. R. S. 1943. We find no merit to the plaintiff's contention.

The plaintiff complains of the failure of the trial court to give plaintiff's requested instruction No. 14. This instruction reads as follows: "You are instructed that under Section 70-671 the Defendant Irrigation district is liable for all sources of water that came upon the plaintiff's land from any break, or overflow from any of their ditches or drains."

Section 70-671, R. R. S. 1943, reads as follows: "Any such district shall be liable for all breaks, overflow and seepage damage. Damages from seepage shall be recoverable when and if it accrues."

Section 70-671, R. R. S. 1943, comes under Chapter 70, article 6, and relates to public power and irrigation districts. The district here involved was organized pursuant to Chapter 46, titled "Irrigation." See §§ 46-101 to 46-128, R. R. S. 1943. Section 70-671, R. R. S. 1943, applies only to public power and irrigation districts, and has no applicability to an irrigation district such as the district here involved, nor to the County of Scotts Bluff.

The plaintiff contends that the trial court erred in admitting, over objections, the defendants' evidence with reference to the breaking of the dam; that there was no evidence in the record that the breaking of the dam contributed to the floodwaters which damaged the plaintiff, for the reason that the dam did not break until after 9 p.m., and the plaintiff's farm was flooded at 6 p.m.; and that the admission of this evidence was prejudicial because it was calculated to draw the attention

of the jurors away from the real cause of the plaintiff's damages.

The evidence did show that the breaking of the dam caused a large amount of water to escape and flow upon the plaintiff's land, bringing with it further debris. The evidence also showed that the plaintiff's cattle stood in water until after midnight. He claimed this as damage to his cattle. In addition, the evidence as to the breaking of the dam shows that had the plaintiff not been damaged by the water coming from the structure in the drainage ditch, his crops would have received damage from the water caused by the breaking of the dam.

Defendants were in no manner liable for the escape of the water by the breaking of the dam. We conclude that the trial court did not commit prejudicial error in admitting this evidence.

We have determined the assignments of error necessary for a determination of this appeal, and other assignments of error need not be considered.

For the reasons given in this opinion, the judgment rendered by the trial court is affirmed.

AFFIRMED.