ROBERT E. JOHNSON, JR., APPELLANT, V. NM FARMS BARTLETT,
INC., A NEBRASKA CORPORATION, APPELLEE.
WHEELER III, A NEBRASKA GENERAL PARTNERSHIP, APPELLANT, V.
NM FARMS BARTLETT, INC., A NEBRASKA CORPORATION,
APPELLEE.
414 N.W.2d 256

Filed October 23, 1987.    Nos. 85-963, 85-964.

Robert H. Berkshire and Richard N. Berkshire, for appellants.

Douglas Pauley of Conway, Connolly and Pauley, P.C., for appellee.

BOSLAUGH, C.J., Pro Tem., WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

PER CURIAM.

These two cases were consolidated for trial and for argument in this court. In the first case filed in the district court, designated as case No. 85-964 in this court, appellant, Wheeler

III, a Nebraska general partnership, sued appellee, NM Farms Bartlett, Inc., a Nebraska corporation, claiming the latter discharged diffused surface waters upon Wheeler III's land, which is located immediately to the north of a portion of NM Farms' lands, and sought damages and an injunction preventing NM Farms from so doing. Later, appellant, Robert E. Johnson, Jr., one of the three Wheeler III partners and sole owner of land immediately to the north of that owned by Wheeler III, sued NM Farms, claiming that it discharged diffused surface waters onto his land as well. He too sought damages and injunctive relief. Johnson's action is designated as case No. 85-963 in this court. In case No. 85-964, the district court permanently enjoined NM Farms from discharging water onto the Wheeler III land, but found that Wheeler III was not entitled to damages. In case No. 85-963, the district court made no ruling on Johnson's request for a permanent injunction and found he was not entitled to damages, notwithstanding the fact that, according to all the parties, Johnson and NM Farms had stipulated that no evidence would be adduced on the damages issue pending determination as to whether NM Farms was liable to Johnson. In these appeals both Wheeler III and Johnson assign as operative errors the district court's (1) failure to award damages, (2) denial of their motions in limine seeking to exclude evidence concerning their desire to have NM Farms purchase their lands, and (3) finding that Wheeler III had granted NM Farms an oral easement to run water across its land. NM Farms has not appealed the injunction entered against it in favor of Wheeler III. For the reasons hereinafter discussed, we dismiss Johnson's appeal and affirm the district court's judgment in Wheeler III's action.

In an appeal of an equity action, this court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where the credible evidence is in conflict on a material issue of fact, we consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hughes v. Enterprise Irrigation Dist., ante* p. 230, 410 N.W.2d 494 (1987); *Platte Valley Fed. Sav. & Loan Assn. v. Gray, ante* p. 135, 409 N.W.2d 617 (1987);

Neb. Rev. Stat. § 25-1925 (Reissue 1985). Further, where the trial judge as the finder of fact has viewed the premises and the record discloses what the judge saw and the findings he made as a result thereof, this court, provided the record contains competent evidence to support those findings, gives consideration to any competent, relevant facts revealed by the view and to the findings made as a result thereof. See, *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985); *Burgess v. Omahawks Radio Control Org.*, 219 Neb. 100, 362 N.W.2d 27 (1985). Since the record in this case does not tell us what the judge saw nor what findings he made as a result of his view, we give no weight to the fact that he viewed some of the lands involved.

The lands in question are located in this state's Sandhills. In this locale, water, where no natural watercourse exists, fills the lower areas, and then proceeds to the next lower area, and travels across the land to a natural watercourse. Moreover, even when not connected to a water channel, low areas sometimes fill with water because of underground seepage.

NM Farms owns a quarter section of land which abuts the southern boundary of the quarter section owned by Wheeler III. Wheeler III's land is lower in elevation than is NM Farms' quarter section, dropping 11 feet from south to north. Johnson owns the quarter section abutting the northern boundary of Wheeler III's land and even lower in elevation, dropping an additional 4 to 5 feet from south to north.

Between 1979 and 1982, NM Farms drained and leveled its quarter section by cutting down the hills and filling in the low areas, lakes, and ponds, so as to enable it to use a center pivot irrigation system. The water displaced by these operations ran north over the Wheeler III and Johnson lands, over land owned by Joe Kneivel, under an east-west county road, and over land owned by Gerald Titterington, to Beaver Creek, which bisected the Mignery Ranch north of the Wheeler III land.

In addition to the aforesaid quarter section, NM Farms owns lands which abut the western boundaries of the Wheeler III, Johnson, and Kneivel lands. These NM Farms lands are referred to throughout the remainder of this opinion as NM Farms' western lands. The land NM Farms owns to the south of

the Wheeler III land will be referred to as NM Farms' quarter section.

Wheeler III purchased its land in 1979, leveled it, installed a well and a center pivot irrigation system, and commenced farming operations in the spring of 1980 on what had previously been pastureland.

In 1979 or 1980, NM Farms built a dam in a drainageway leading to the Wheeler III land for the purpose of keeping "the water from running further into" NM Farms' quarter section and to "impound the water or to pump up to the pivot system."

The fall of 1982 and spring of 1983 brought abnormally high amounts of precipitation to the Sandhills area. The water table was high, and water drainage problems appeared on properties which had had none before. The high water table rendered some land unfarmable and unrentable, and such land consequently sat idle.

While Wheeler III farmed its land in 1983, NM Farms did not farm its quarter section "[b]ecause the water table was too high in the low areas to the extent it was shallow lakes." Instead, the property was placed in the federal Payment-in-Kind program.

Prior to 1983, there was no natural watercourse on the Wheeler III, Johnson, or Kneivel lands. Rain and irrigation water would spread out on the Wheeler III property, collect in its pockets and valleys to form ponds, and then evaporate or become absorbed into the ground and underground channels.

At some point, NM Farms repaired its dam "where it was . . . poorly constructed," but in the spring of 1983, the dam nonetheless broke. That event caused a large amount of water to flow onto the lower northern properties. The rush of water cut a channel through the Wheeler III, Johnson, and Kneivel lands, and then turned east before again flowing north toward the Mignery Ranch and into Beaver Creek.

Sometime before mid-June of 1983, Steve Koinzan, the farm manager for Wheeler III and Johnson, and their farm operator, Rick Schindler, met with John Bryant, NM Farms' manager. They attempted to reach some joint understanding or agreement to alleviate the water problems each of them was experiencing. Bryant proposed two alternative solutions. The

first alternative was to develop a system to drain the excess surface waters from the quarter section owned by NM Farms through the Wheeler III, Johnson, Kneivel, Titterington, and Mignery Ranch lands into Beaver Creek. This would be accomplished by connecting ditches to follow the path of least resistance on these lands. The second alternative was to construct a ditch through NM Farms' western lands and then discharge the waters into the creek.

After examining a survey of the properties, prepared by NM Farms, Koinzan told Bryant he liked the first alternative and would recommend its adoption to Wheeler III and Johnson, but that he himself had no authority to sign an easement for NM Farms to discharge water onto the Wheeler III and Johnson lands. Koinzan thought that the first alternative would benefit Wheeler III because it would drain the ponds on its land. Bryant later dropped off an easement agreement at Koinzan's office, and Koinzan forwarded it on. NM Farms then obtained an easement across the Mignery Ranch for $1, and across Titterington's property for $10,000. Wheeler III and Johnson eventually rejected the easement proposed to them, but nonetheless decided to participate in the first alternative by constructing a ditch which very closely followed the survey prepared by NM Farms. In addition, Wheeler III constructed some lateral ditches to help drain the ponds on its property.

During the first part of May 1984, Wheeler III was unable "to completely plant [its land], it was too wet and there was [sic] still a few potholes and the ground next to the ditches and the generally flat low laying [sic] areas we still lost part of that from dying out." There was "an extreme large amount of water flowing down through the ditchs [sic], live water, from the south at that time and it kept the property fairly wet where you couldn't get and get around with the machinery." The ditches caused several problems. The tractor stuck several times, and the center pivots kept getting stuck in the ditches as they went through. Nonetheless, neither Wheeler III nor Johnson made any complaint to anyone at NM Farms about a water problem during the 1984 crop-year.

During July, August, and September of 1984, NM Farms pumped water, which came from a watershed south of its

quarter section, into the ditch. The water then flowed toward Beaver Creek across the Wheeler III, Johnson, Kneivel, and Titterington lands. The Titterington land was planted to hay, and Titterington asked NM Farms to stop pumping so that he could put up his hay. NM Farms stopped pumping the water, and 2 days later the water stopped running across Titterington's land, so that he could harvest his hay.

Wheeler III's 1984 popcorn crop was caught in a September frost, and, consequently, the prospective purchaser rejected the corn because of frozen and immature kernels.

In late November of 1984, Johnson contacted Bryant and indicated he would like NM Farms to purchase his and Wheeler III's lands, or enter into some sort of a long-term cash lease agreement. Bryant indicated he did not believe NM Farms would be interested, but suggested that he contact Kenneth Morrison of the Morrison Quirk Grain Corporation. In response, Johnson said he "might have to reconsider [the] drainage agreement that [he] had" with NM Farms.

After this conversation, NM Farms decided to construct a different route for its water discharges, totally outside of the Wheeler III, Johnson, and Kneivel lands. This new drainage system was started in 1984 and completed in early 1985, at a cost of $50,000. It, in effect, implemented NM Farms' second alternative solution as proposed in 1983. In constructing the new ditch NM Farms filled in a swale on the south side of the ditch to prevent water from flowing back onto NM Farms' property, but NM Farms did nothing on the north side of the ditch to prevent water from flowing from the diversion ditch onto the Wheeler III land.

In 1985 Wheeler III attempted to lease its land, but none of the 18 prospective tenants were interested. Thus, the land was not farmed at all in 1985.

In May of 1985, water backed up and overran NM Farms' new ditch, which had filled with sand. As a consequence, water again rushed north toward Titterington's property. On May 9, 1985, Titterington built a small dike on Wheeler III's land to prevent further water flow.

Wheeler III adduced testimony that in 1983 it received $13,000 from Crop Advisory pursuant to the terms of a lease

under which Crop Advisory farmed Wheeler III's land. However, Crop Advisory did not follow up on its commitment to enter into a like lease for 1984. Wheeler III then entered into a lease with Crop Advisory to share costs and profits on a half-and-half basis. As a consequence, Wheeler III suffered a loss of $5,230.91. There was testimony that the fair rental value of Wheeler III's land for 1985 was $9,945, but it does not appear that Wheeler III had obtained any commitment from anyone to lease the land for 1985. In addition, Wheeler III adduced testimony that as a result of the water damage the value of its land was diminished by an amount ranging from $39,000 to $48,000, that it spent $11,700 in 1983 to dig ditches for the purpose of alleviating its water problems, and that additional expenditures of between $5,000 and $6,000 would be required to make its lands farmable.

On the other hand, NM Farms adduced testimony that while the value of Wheeler III's land dropped from $750 per acre in 1983 to its present value of $360 per acre, that decrease was due to general economic conditions and to the general decline in farmland values. It was this witness' opinion that Wheeler III's land had not been damaged to any extent from flooding and that if there were damage, it was not permanent. It was this witness' further opinion that the addition of the drainage ditches increased the value of Wheeler III's land.

We concern ourselves first with the Johnson case, for it is not yet ripe for appeal and therefore is not properly before us. In determining that Johnson was not entitled to damages, the district court resolved a matter not before it in view of the stipulation that no evidence concerning damages would be adduced until after resolution of whether NM Farms had any liability to Johnson. If the district court meant by its decision to rule that it did not award damages because it found NM Farms had no liability to Johnson, we cannot discern that intention from the mere fact that the court denied Johnson's prayer for a permanent injunction. Since the purpose of an injunction is preventive, protective, and prohibitory, and it will not issue against discontinued acts unless there are probable grounds to believe there will be a resumption of the violations or activities, *Stuthman v. Lippert*, 205 Neb. 302, 287 N.W.2d 80 (1980), such

a ruling could just as well flow from a conclusion that it was unlikely NM Farms would in the future discharge its diffused surface waters onto Wheeler III's land. In any event, as the following analysis of Wheeler III's action will demonstrate, a finding that NM Farms has no liability to Johnson would be erroneous.

While it may be appropriate under certain circumstances to bifurcate trials, this court acquires no jurisdiction until there has been a judgment or final order in the court from which the appeal is taken. *McCook Equity Exch. v. Cooperative Serv. Co.*, 223 Neb. 197, 388 N.W.2d 811 (1986); Neb. Rev. Stat. § 25-1911 (Reissue 1985). Thus, we dismiss Johnson's appeal for lack of jurisdiction.

This brings us to Wheeler III's first assignment of error, the district court's failure to award it damages.

We conclude from the evidence that Wheeler III's damages, if any, and whatever the proper elements thereof may be, arose from four sources: (1) a raised water table; (2) the leveling and draining of NM Farms' quarter section; (3) NM Farms' September 1984 water pumping; and (4) the breaking of NM Farms' dam.

The water table rose as the result of unusual amounts of precipitation, an act of nature for which NM Farms has no liability. *Baum v. County of Scotts Bluff*, 172 Neb. 225, 109 N.W.2d 295 (1961).

The analysis of NM Farms' liability for such damages, if any, as may have resulted from the leveling and draining of its quarter section rests initially upon Neb. Rev. Stat. § 31-201 (Reissue 1984), which provides:

Owners of land may drain the same in the general course of natural drainage by constructing an open ditch or tile drain, discharging the water therefrom into any natural watercourse or into any natural depression or draw, whereby such water may be carried into some natural watercourse; and when such drain or ditch is wholly on the owner's land, he shall not be liable in damages therefor to any person or corporation.

In *Jameson v. Nelson*, 211 Neb. 259, 263-64, 318 N.W.2d 259, 262-63 (1982), this court set out the legal principles arising

from applications of the foregoing statute:

The owner of land is the owner of surface waters which fall, arise, or flow upon it, and he may retain them for his own use without liability. He may also change their course on his own land by ditch or embankment, but he may not divert them upon the lands of others except in depressions, draws, swales, or other drainways through which such waters were wont to flow in a state of nature. *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962). An owner of land has the right in the interest of good husbandry to drain ponds or basins thereon of a temporary character, and which have no natural outlet or course of flow, by discharging the waters thereof by means of an artificial channel into a natural surface-water drain on his own property, and through such drain over the land of another proprietor in the general course of drainage in that locality, even though the flow in such natural drain is thereby increased over the lower estate, and provided that this is done in a reasonable and careful manner and without negligence. *Pospisil v. Jessen*, 153 Neb. 346, 44 N.W.2d 600 (1950). While the flow of surface waters in a natural depression, draw, swale, or other natural drainway may be temporary and occasional, the course which they uniformly take is the controlling factor. *Nichol v. Yocum, supra.* It is the law of this state that waters resulting from rainfall and melting snow are diffused waters which an owner may control on his own land. He may collect them, change their course, pond them upon his land, or cast them into a natural drain without liability. He may not, however, collect such waters and divert them onto the lands of another except in depressions, draws, swales, or other drainageways through which such waters were wont to flow *in a state of nature. Delp v. Laier,* [205 Neb. 417, 288 N.W.2d 265 (1980)].

(Emphasis in original.) See, also, *Eunice Harrington Investments, Ltd. v. Wallace*, 207 Neb. 373, 299 N.W.2d 174 (1980).

This court has also held that alteration of natural drainage is acceptable where the interests of good husbandry are served,

circumstances are such that alteration is necessary, and the particular alteration is reasonable under all the circumstances present. *Bohaty v. Briard*, 219 Neb. 42, 361 N.W.2d 502 (1985).

The evidence convinces us that the alterations which NM Farms made on its quarter section served the interests of good husbandry and were necessary, but that they were not undertaken in a reasonable, nonnegligent manner under all the circumstances present, and resulted in a concentrated discharge of diffused surface waters from its quarter section onto Wheeler III's land in other than depressions, draws, swales, or drainageways through which said waters were wont to flow in the natural condition of the lands involved. The evidence further convinces us that the waters so discharged were the proximate cause of some of Wheeler III's damages.

The waters pumped from NM Farms' western lands into the ditch are characterized by Wheeler III as diffused surface waters. Since the record does not contradict that characterization, the foregoing analysis relating to NM Farms' liability for leveling and draining its quarter section applies as well to this third source of excess water discharged upon Wheeler III's land.

This brings us to the fourth and last source, the waters discharged by the breakage of the dam. *Barnum v. Handschiegel*, 103 Neb. 594, 173 N.W. 593 (1919), presented a suit for damages suffered when a dam defendant had built across a natural stream broke. The structure had been erected " 'as an ice and fish reservoir and for irrigation' " and other uses. *Id*. at 595, 173 N.W. at 593. Rev. Stat. § 3444 (1913) then provided, as does present Neb. Rev. Stat. § 46-241 (Cum. Supp. 1986), that the owner of a "storage reservoir" shall be liable for damages resulting from, among other things, "the breaking of the embankment of such reservoir." Section 3444 further provided, as does present Neb. Rev. Stat. § 46-243 (Reissue 1984), that a "reservoir constructed for the purpose of holding water back and raising it in order that it may be applied to lands of a higher level . . . shall not be considered a storage reservoir . . . ." The *Barnum* court concluded that in view of the statutory language exempting a structure which held water for irrigation from the definition of "storage reservoir," the owner

of a nonstorage reservoir was liable, in the event of breakage, only if he or she had negligently constructed or maintained the structure. The *Barnum* court also held that in such a case the "burden of proof is upon the plaintiff; but, when he has established the breaking of a dam and resulting injury, he has made a *prima facie* case. The defendant must then show that the dam was not negligently constructed or maintained." *Id*. at 598, 173 N.W. at 594. Although the case before us does not involve the damming of a natural stream, we nonetheless deem the situation at hand to be analogous to that presented in *Barnum*, and we therefore apply to the present case the rules announced by the *Barnum* court.

We conclude from the evidence that NM Farms built its dam, at least in part, to hold water for irrigation and that under the circumstances its dam does not constitute a storage reservoir. However, we also determine that NM Farms failed to show its dam was not negligently constructed or maintained and that it is therefore liable for the damages Wheeler III sustained as a consequence of the breakage of the dam.

Nonetheless, notwithstanding the fact that NM Farms impermissibly discharged certain waters onto Wheeler III's quarter section, the district court's judgment is correct. This is so because where water from another source has been added to water from a source for which a defendant is liable, and the combined waters cause damage, it is incumbent upon the plaintiff to establish either that his or her entire damages would have occurred from the water for which the defendant is liable, or to establish the amount of the damages caused by the water for which the defendant is liable. *Schmidt v. Chimney Rock Irrigation Dist.*, 209 Neb. 1, 305 N.W.2d 888 (1981); *McGill v. Card-Adams Co.*, 154 Neb. 332, 47 N.W.2d 912 (1951); *Seibold v. Whipple*, 143 Neb. 167, 9 N.W.2d 154 (1943). See, also, *Shadow Isle, Inc. v. Granada Feeding Co., ante* p. 325, 411 N.W.2d 331 (1987).

Since NM Farms is not liable for all of Wheeler III's damages, some of those damages having resulted from unusual amounts of precipitation, the failure to apportion the damages attributable to the impermissibly discharged waters precludes Wheeler III from recovering any of its damages.

The foregoing determination renders the remaining two assignments of error immaterial insofar as this case is concerned. However, as one of the remaining assignments becomes moot by resolution of the other, and that other assignment may bear on the resolution of Johnson's cause, we proceed to a consideration thereof.

We note the finding Johnson attributes to the district court, that "Wheeler III orally granted NM Farms an easement to run water onto and across Wheeler III property," does not appear in the record. Nonetheless, such a finding, if it exists, is not warranted by the evidence.

Neb. Rev. Stat. § 36-103 (Reissue 1984) provides:

No estate or interest in land, other than leases for a term of one year from the making thereof, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered, or declared, unless by operation of law, or by deed of conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same.

Neb. Rev. Stat. § 36-106 (Reissue 1984) provides: "Nothing contained in sections 36-101 to 36-106 shall be construed to abridge the powers of a court of equity to compel the specific performance of agreements in cases of part performance."

In order to establish that an oral contract falls within the § 36-106 exception to the statute of frauds found in § 36-103, the proponent of the contract must establish by clear, satisfactory, and unequivocal evidence the terms of the contract, that the acts done in the performance thereof are referable solely to that contract, and that the acts performed are of such a nature that nonperformance of the contract by the other party would amount to a fraud upon the proponent.

Even if the other requirements were met, questions with which we do not concern ourselves, we are not clearly, satisfactorily, and unequivocally convinced that the acts performed by NM Farms were solely referable to any oral agreement there may have been with Johnson. That determination renders unnecessary any consideration as to whether the district court should have admitted testimony of

Johnson's need to reconsider his agreement with NM Farms.
APPEAL IN NO. 85-963 DISMISSED.
JUDGMENT IN NO. 85-964 AFFIRMED.